CARGILL INCORPORATED, Plaintiff,

v.

UNITED STATES of America, Defendant.

No. 98–2036 JRT/FLN.

United States District Court, D. Minnesota.

March 29, 2000.

---

Gerald A. Kafka, Dewey Ballantine, Washington, DC, for plaintiff.

Gerald B. Leedom and Daniel R. Conrad, Attorneys, United States Department of Justice, Tax Division, Washington, DC, for defendant.

## MEMORANDUM OPINION AND ORDER

TUNHEIM, District Judge.

This matter is before the Court on plaintiff Cargill Inc.'s ("Cargill") motion for summary judgment on its tax refund claim of approximately $3,175,506 plus interest for taxable years 1978, 1979, and 1980. The basis for Cargill's claim is that it is the tax owner of an expansion to a grain terminal facility that it leases from the municipal government of the Port of Portland, Oregon. Cargill claims that it erroneously treated its interest in the expansion as a leasehold rather than an ownership interest, and as a result it deducted its principal and interest payments as "rent" and failed to deduct depreciation (for all three years) and claim investment tax credit (for 1978 only). The government claims that Cargill's attempted change constitutes a change in its method of accounting for which the Commissioner's consent is required. Also before the Court is the government's motion to strike certain portions of the statement of Bruce Barnett. For the reasons set forth below, the Court denies both motions.

## BACKGROUND

Cargill is an international marketer, processor, and distributor of agricultural, food, financial, and industrial commodities. For both federal income tax and financial

accounting purposes, Cargill uses an accrual method of accounting.

Since 1954, Cargill has leased a grain terminal facility from the municipal government of the Port of Portland, Oregon (the "Port"). In 1975, Cargill and the Port entered into a twenty-one year lease with two five-year options to renew. The lease contemplated that any renovation of the basic facility would be subject to the lease and that Cargill could request that the Port issue industrial development bonds ("IDBs") on Cargill's behalf to finance the renovation. Cargill treats its lease of the basic facility as a true, or operating, lease for tax purposes, and this underlying lease is not at issue.

In 1976, the Port issued $13.2 million of IDBs to expand the basic facility, which consisted primarily of the addition of new and updated equipment for loading and unloading cargo to and from the storage facility, as well as related modifications to the wharves, docks, and workhouses. In 1978, Cargill completed the expansion at a total cost of $14.7 million. Cargill directly financed the portion of the expansion not financed by IDBs.

In return for its use of the facility, Cargill makes payments to the Port, which in turn repays the principal and interest to the bondholders. Other than the Port's obligation to use Cargill's payments in this manner, the Port does not secure the bonds; they are guaranteed by Cargill. The governing lease contains no purchase option, and it provides that Cargill's rent would be increased by an amount sufficient to cover interest and principal payments on the IDBs issued to finance the expansion. The lease also gives Cargill the right to terminate the lease under certain circumstances, including that, in Cargill's sole opinion, continued operation is uneconomical.

Cargill has consistently treated its lease of the basic facility as a true, or operating, lease, and has deducted the rent payments

for the basic facility. Cargill has also consistently treated itself as the owner of the portion of the expansion that it financed directly. Until 1993, however, Cargill treated its interest in the IDB-financed portion of the expansion as a lease, a characterization which it now contends was erroneous. Although the payments that Cargill made to the Port were designated as "rent," Cargill contends that they were actually principal and interest payments and that it is the tax owner of the entire expansion.

According to Cargill, during the 1970s its tax department conducted independent examinations of all transactions that financial records indicated were "capital leases" to determine whether each lease should be treated as a true lease or the acquisition of an asset. Because the financial records characterized Cargill's interest in the expansion as an operating lease rather than a capital lease, Cargill contends that its tax department was unaware of the need to examine this transaction, and had it done so, it would have determined that Cargill should have treated it as the acquisition of an asset from the beginning. Cargill has provided a list of eight other IDB-financed capital leases for which it treated itself as the owner of the asset and reported investment tax credit and depreciation deductions. Essentially, Cargill argues that it is seeking to bring its treatment of the Port of Portland expansion into conformity with its established tax treatment of capital leases.

On July 30, 1991, Cargill filed amended returns claiming refunds for the tax years 1978, 1979, and 1980, on the ground that it was the tax owner of the IDB-financed portion of the expansion and was entitled to depreciation deductions for all three years and investment tax credit for 1978. On July 30, 1996, the IRS National Office issued a technical advice memorandum denying Cargill's claims for tax years 1978 and 1979 [1] on the ground that Cargill is

---

1. The government has apparently never notified Cargill of its position with respect to the

attempting an unauthorized change in method of accounting. The government contends that, contrary to Cargill's assertions, it intentionally treated the expansion as an operating lease. The government distinguishes the eight other capital leases by pointing out that they all included purchase options for nominal amounts. Because Cargill intentionally chose to treat its interest as a lease, the government argues that Cargill's attempt to call it an ownership interest constitutes a change in its method of accounting, for which Cargill must get consent from the Commissioner.

## ANALYSIS

### A. Standard of Review

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R.Civ.P. 56(c). Only disputes over facts that might affect the outcome of the suit under the governing substantive law will properly preclude the entry of summary judgment. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In considering a motion for summary judgment, a court is required to view the facts in a light most favorable to the nonmoving party. *See Lomar Wholesale Grocery, Inc. v. Dieter's Gourmet Foods, Inc.*, 824 F.2d 582, 585 (8th Cir.1987). Summary judgment is to be granted only where the evidence is such that no reasonable jury could return a verdict for the nonmoving party. *See Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. The moving party bears the burden of bringing forward sufficient evidence to establish that there are no genuine issues of material fact and that the movant is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

### B. The Consent Requirement

■ In determining the ownership of property for tax purposes, courts must

1980 claim.

look to "the objective economic realities of a transaction rather than to the particular form the parties employed." *Frank Lyon Co. v. United States*, 435 U.S. 561, 573, 98 S.Ct. 1291, 55 L.Ed.2d 550 (1978). When objective economic realities are to the contrary, courts do not regard the parties' characterizations of a transaction as controlling. *See id.* Cargill contends that, according to these principles, it is required to treat itself as the tax owner of the IDB-financed portion of the expansion. The Court need not decide whether Cargill's prior treatment of the expansion was improper, however, because Cargill must obtain the Commissioner's consent to change its accounting method whether or not its current method is proper.

The Internal Revenue Code requires a taxpayer to obtain the consent of the Commissioner prior to changing "the method of accounting on the basis of which he regularly computes his income in keeping his books." 26 U.S.C. § 446(e). It is undisputed that Cargill has not secured the Commissioner's consent. Even if Cargill is correct that its prior treatment of the expansion was legally improper, the Commissioner's consent is required for it to change to the proper method. *See Diebold, Inc. v. United States*, 891 F.2d 1579, 1583 (Fed.Cir.1989); *United States v. Kleifgen*, 557 F.2d 1293, 1298 n. 9 (9th Cir. 1977); *Witte v. Commissioner*, 513 F.2d 391, 393–95 (D.C.Cir.1975); *American Can Co. v. Commissioner*, 317 F.2d 604, 606 (2d Cir.1963), *overruled on other grounds by Malat v. Riddell*, 383 U.S. 569, 86 S.Ct. 1030, 16 L.Ed.2d 102 (1966) (per curiam); *Commissioner v. O. Liquidating Corp.*, 292 F.2d 225, 230–31 (3d Cir.1961); *see also Rankin v. Commissioner*, 138 F.3d 1286, 1289 (9th Cir.1998) (explaining that where a change in accounting method alters the timing of deductions and income recognition, it requires the Commissioner's consent even when the previous method was invalid). Examples in the Treasury

Regulations also confirm that the Commissioner's consent is required regardless of whether the prior method was improper. *See* Treas. Reg. § 1.446–1(e)(2)(iii). As a number of courts have noted, consent is required regardless of the impropriety of the former method because the danger of income distortion detrimental to the government is present in either case. *See, e.g., Witte,* 513 F.2d at 393 n. 5. While some Tax Court cases hold otherwise, *see, e.g., North Carolina Granite Corp. v. Commissioner,* 43 T.C. 149, 167–68, 1964 WL 1160 (1964), this Court agrees with the clear weight of authority that if a taxpayer's proposed change constitutes a change in method of accounting within the meaning of § 446(e), the Commissioner's consent is required whether or not the prior method was a proper one.

## C. Change in Method of Accounting

Cargill next argues that the change it proposes is not a change in its "method of accounting," but rather a change in the characterization of its interest which does not require consent. A change in the method of accounting includes both a "change in the overall plan of accounting for gross income or deductions" and a "change in the treatment of any material item used in such overall plan." Treas. Reg. § 1.446–1(e)(2)(ii)(a). A material item is "any item which involves the proper time for the inclusion of the item in income or the taking of a deduction." *Id.* Conversely, a change in method of accounting does not include correction of mathematical or posting errors, nor does it include "adjustment of any item of income or deduction which does not involve the proper time for the inclusion of the item of income or the taking of a deduction." *Id.* at § 1.446–1(e)(2)(ii)(b).

There is no dispute that Cargill's attempt to change its treatment of the costs associated with the IDB-financed portion of the expansion from current rental deductions to accelerated depreciation deductions and investment tax credit affects the timing of these deductions. As such, the issue is not whether Cargill can deduct its costs, but when. This circumstance would appear to bring Cargill within the reach of the consent requirement. *See Rankin,* 138 F.3d at 1288 (explaining that regulations define an accounting method to involve when income is reported, not how much income is reported, or whether a deduction would ever be appropriate). Nevertheless, Cargill argues that because the timing consequences flow automatically from the characterization of its interest in the lease, its proposed recategorization of this interest is not a change in its method of accounting. Cargill cites *Coulter Elecs., Inc. v. Commissioner,* 59 T.C.M. (CCH) 350, 364–65 (1990), *Standard Oil Co. v. Commissioner,* 77 T.C. 349, 382–83, 1981 WL 11284 (1981), and *Underhill v. Commissioner,* 45 T.C. 489, 496–97, 1966 WL 1232 (1966).

The Court does not find these cases persuasive because they are both distinguishable and rely on erroneous legal precepts. In *Underhill,* the court noted that "[t]he issue ... is the extent to which payments received by petitioner are taxable or nontaxable—i.e., the character of the payment—not the proper method or time of reporting an item the character of which is not in question." *Underhill,* 45 T.C. at 496. Thus, *Underhill* defined "characterization" to mean whether an item is taxable, not when it is to be taxed. This definition does not help Cargill, because Cargill is not contending that it has paid tax on something that is not taxable; instead, it is contending that it should be allowed to change the manner in which it accounts for its costs over time. Similarly, *Standard Oil* recognized that "changes for which one must have advance permission fall generally into two categories: ... (2) decisions concerning whether payments are for capital items, which should be deducted ratably over the useful life of the asset, or for expense items, which may be currently deducted." *Standard Oil,* 77

T.C. at 381–82. Cargill's proposed change falls squarely within this definition.

Even if these cases were not distinguishable, however, they all ultimately rest on the erroneous premise that consent is not required if the taxpayer's previous treatment of the item was improper. *See Standard Oil*, 77 T.C. at 383 ("In reality petitioner has no choice ... in determining whether to deduct the costs before us. In such cases, the strictures of section 446(e) do not apply."); *Underhill*, 45 T.C. at 497 ("Petitioner had no choice in determining whether an obligation was speculative or nonspeculative, nor was there any doubt or choice about the method or time of reporting income once that determination was made."); *Coulter*, 59 T.C.M. at 364–65 (relying on *Underhill* and *Standard Oil* and explaining that "although there is a timing consequence to the outcome of the characterization, it is automatically determined by the characterization and no change of accounting within the meaning of section 446 is involved."). These cases hold that, where tax law requires an item to be treated in a certain way, the treatment of that item in accordance with applicable law is a "characterization" issue rather than an accounting issue, regardless of the timing consequences. This analysis is at odds with both *Diebold* and *Witte*, which held that consent was required even though the taxpayer contended that the proposed method of accounting was the only proper method. *See Diebold*, 891 F.2d at 1583 (stating that the taxpayer's argument that the property could not be treated as inventory under any accounting method was irrelevant); *Witte*, 513 F.2d at 391 (noting that the taxpayer proposed to adopt the only correct method). As the *Witte* court noted, § 446(e) requires consent whenever the treatment of an item has timing consequences "[e]xcept as otherwise expressly provided in this chapter." *See Witte*, 513 F.2d at 393 (quoting § 446(e)). Like the petitioner in *Witte*, Cargill has not directed the Court to any provision of the Code that sets forth such a "characterization" exception. Accordingly, the Court concludes that no such exception exists.

Cargill points to a few other authorities in support of its characterization argument. It notes, for example, that in 1968, the IRS proposed a regulation that would have expressly defined as a change in method of accounting the adjustment required when payments were deducted as rent where the transaction should have been treated as a sale. *See* 33 Fed.Reg. 18936 (1968). Cargill argues that because this proposed definition never became a part of the final regulations, the government has indicated that such an adjustment is not a change in method of accounting. While the Commissioner's failure to adopt a proposed regulation may be helpful evidence of statutory policy, *see Hauptman v. Director of Internal Revenue*, 309 F.2d 62, 65 (2d Cir.1962), in this case such failure is not particularly persuasive, because Cargill's proposed change falls within the language of the regulation as it is written. Furthermore, the regulations already address a similar issue; § 1.446–1(e)(2)(ii)(b) states, in pertinent part, that

> a correction to require depreciation in lieu of a deduction for the cost of a class of depreciable assets which has been consistently treated as an expense in the year of purchase involves the question of the proper timing of an item, and is to be treated as a change in method of accounting.

Cargill's proposed change is a "correction to require depreciation in lieu of a deduction" and accordingly falls within this definition of "method of accounting." Where the regulations already adequately address an issue, the Court declines to read any special significance into the Commissioner's failure to adopt further regulation that would simply have supplied an additional degree of specificity.

Finally, Cargill cites several technical advice memoranda that purport to indicate that whether a transaction is a sale-leaseback or a financing arrangement is a characterization issue that does not involve a

method of accounting. *See* Tech. Adv. Mem. 9307002 (Oct. 5, 1992); Tech. Adv. Mem. 9237045 (May 6, 1992). Leaving aside that technical advice memoranda may not be used or cited as precedent, *see* 26 U.S.C. § 6110(k)(3), these memoranda do not persuade the Court that the consent rule should not apply in this case. Neither of them address the issue of consent, and TAM 9307002, like the cases Cargill cites, relies on the mistaken assumption that no method of accounting is involved where the applicable tax law prescribes only one proper treatment of an item. The Court therefore rejects Cargill's argument that because its proposal involves the characterization of its ownership interest, it is outside the strictures of § 446(e).

### D. First Year

■ Cargill next argues that it is not attempting to change its method of accounting because it is seeking to adopt the new method for the first tax year in which the prior method was used. The cases Cargill cites, however, carve out a narrow exception to the consent requirement into which Cargill does not fit. In *Mamula v. Commissioner*, the IRS itself disallowed the taxpayer's chosen method of accounting shortly after the taxpayer began using it. *See* 346 F.2d 1016, 1017 (1965). The Ninth Circuit held that under those circumstances, where the IRS compelled the taxpayer to adopt another method, the taxpayer was free to choose the most advantageous of the remaining methods without the Commissioner's consent. *See id.* at 1018–19. Similarly, in *Silver Queen Motel v. Commissioner*, the IRS disallowed the taxpayer's choice of double-declining balance depreciation for the first year in which the taxpayer sought to use it. *See* 55 T.C. 1101, 1105, 1971 WL 2593 (1971). The court explained that the taxpayer did not need permission to choose another

method because the taxpayer was not seeking to substitute a new method in place of one that it had used regularly. *See id.*

In contrast to those cases, here the Commissioner has not prohibited Cargill from treating its interest in the IDB-financed portion of the expansion as a lease, and Cargill treated its interest as such for fifteen years. Under these circumstances, Cargill does not fit within the narrow exception to the consent requirement that these cases establish. Were the Court to adopt Cargill's extension of *Mamula* and *Silver Queen*, the exception would effectively subvert the general rule requiring consent. *See Diebold*, 891 F.2d at 1583 (holding that the taxpayer was required to obtain consent even though it sought to make the change beginning with the first tax year that the prior method was used). The Court therefore concludes that the fact that Cargill is seeking to adopt the new method for the first year in which the prior method was used is irrelevant to the issue of consent.

### E. Posting Error

■ Cargill's final argument is that it does not need to obtain the Commissioner's consent because under its established accounting method, it would have treated the IDB-financed lease as a capital lease but for an error in its financial records. *See Northern States Power Co. v. United States*, 151 F.3d 876, 883–84 (8th Cir.1998) (holding that a taxpayer need not obtain consent where it seeks to correct its treatment of an item to bring it into conformity with the manner in which it has consistently treated other similar items). Cargill offers the statement of Bruce Barnett, the vice-president of Cargill's tax department from mid–1990 through January 1999.[2]

---

2. The government has moved to strike certain portions of Barnett's statement on the ground that they are not based on personal knowledge and therefore do not meet the requirements of Fed.R.Civ.P. 56(e). Although

Barnett did not work for Cargill during the relevant years, the Court is satisfied that he is competent to testify regarding the prior institutional practices of the department which he headed. *Cf. Agfa–Gevaert, A.G. v. A.B. Dick*

According to Barnett, Cargill's financial records erroneously categorized the lease as an operating lease, whereas under established financial accounting principles, the lease should have been categorized as a capital lease. Had it been identified as a capital lease for financial reporting purposes, Barnett claims that the tax department would then have reviewed the economic substance of the lease transaction and determined that Cargill was the tax owner of the expansion. To support its argument, Cargill points to eight other IDB-financed leases that it treated as capital transactions.

The government responds that, unlike the lease here, the eight other IDB-financed leases all contain purchase options permitting Cargill to purchase the underlying assets for a nominal amount. As recounted by Cargill, Statement of Financial Accounting Standards No. 13 (SFAS No. 13) states that a lease is a capital lease if it meets any one of four criteria:

1. The lease transfers ownership of the property at the end of the lease term;
2. The lease contains a purchase option at a bargain price;
3. The lease term is equal to 75% or more of the estimated economic life of the property; or
4. The present value of the rentals and other minimum lease payments is equal to 90% or more of the fair value of the leased property.

Under the second criterion it was proper to treat these eight other leases as capital leases, but this criterion is not applicable to the lease at issue in this case because it did not contain a purchase option. Cargill has not identified which other criterion applies, but even if it had, the government offers further evidence that Cargill's treatment of the expansion was a deliberate choice, rather than an inadvertent mistake. The government points to a document from Cargill's records which contains the

notation "we will *not* capitalize since we can't purchase it," apparently authored by an individual in the corporate accounting department and referring to the lease at issue here. Furthermore, testimony from Charles Rice, who was head of the tax department during the relevant years, and Bruce Haslerud, a tax attorney for Cargill from 1983 to 1992, indicates that during the 1970s and as late as 1989, Cargill's tax department did not undertake any independent examination of leases, but instead deferred to the numbers provided by financial records.

Cargill responds that the lack of a purchase option is not dispositive under tax law. Because a fact-finder could reasonably infer that Cargill's tax department adopted a deliberate policy of following the financial records, however, the issue of whether Cargill would have capitalized the expansion could depend on whether the lease was erroneously categorized for financial accounting purposes and does not necessarily implicate tax law. As such, this case differs from *Northern States Power*, where the parties stipulated that if the taxpayer's tax department had known the pertinent facts, it would have deducted its losses as ordinary and necessary business expenses. *See Northern States Power*, 151 F.3d at 884. In contrast, here Cargill has not established as a matter of law that its treatment of the expansion was simply a mistake. The government has pointed to evidence sufficient to create a factual issue surrounding whether Cargill adopted a deliberate policy of treating leases without a purchase option as operating leases for both financial accounting and tax purposes. In light of this factual dispute, the Court cannot grant plaintiff's motion for summary judgment.

### ORDER

Based on the submissions of the parties, the arguments of counsel and the entire

---

*Co.,* 879 F.2d 1518, 1523 (7th Cir.1989) (explaining that the inferences business executives draw from information supplied by cus-

tomers and employees are based on personal knowledge). This motion is therefore denied.

file and proceedings herein, **IT IS HERE-BY ORDERED** that:

1.  Plaintiff's motion for summary judgment [Docket No. 48] is **DENIED;** and

2.  Defendant's motion to strike portions of sworn statement of Bruce H. Barnett [Docket No. 38] is **DENIED**.